[No. 2611.]

## F. W. BOHANNON *v.* THE STATE.

1. MURDER.—INDICTMENT charged that the defendant "did with malice aforethought kill J. L. Knox by shooting him with a gun; contrary," etc. This was excepted to because it does not allege that J. L. Knox was a reasonable creature. *Held,* that such an allegation was not necessary, and the exception was properly overruled.

2. SAME.—A further exception taken to the indictment was that it does not charge *express* malice aforethought, and therefore is not a good indictment for murder in the first degree. But *held* that the phrase *malice aforethought* includes both express and implied malice, and is sufficient to charge murder in either degree.

3. CHANGE OF VENUE.—Being indicted for murder in Fort Bend county, the defendant applied for a change of venue on account of prejudice and an influential combination against him in that county. The court granted the application, but, instead of changing the venue to the county of Wharton, whose court house was the nearest to that of Fort Bend, it, of its own motion and despite the objections of the defense, changed the venue to the county of Austin, assigning, in substance, the reason that a fair and impartial trial could not be had in the adjoining county of Wharton. The defense reserved objections, and subsequently pleaded to the jurisdiction of the District Court of Austin county, where the defendant was convicted of murder in the first degree. *Held,* that under Article 576 of the Code of Procedure, the judge who changed the venue

of the case had the authority, of his own motion, to send the case to
Austin county for trial. The discretion confided to district judges by the
said Article 576 is a judicial and not a personal discretion; but, unless it
appears that that discretion was abused to the prejudice of the defend-
ant, its exercise will not be revised by this court on appeal. See the
opinion in this case in exposition of the constitutional and statutory pro-
visions involved, and previous adjudications thereon.

4. SAME.—The discretion conferred on district judges by article 576 is not re-
stricted by the provisions of Article 581, and whether such discretionary
authority is a dangerous power to be conferred on district judges is not
a question for judicial determination. No instance of its abuse has yet
been made manifest to this court.

5. CONTINUANCE—PRACTICE IN THE COURT OF APPEALS.—When no bill of
exceptions appears to the refusal of a continuance, this court will not re-
vise the ruling.

6. CHARGE OF THE COURT.—When the charge of the court to the jury was
full, accurate and free from error, the refusal of requested instructions
was not erroneous, however correct they may be.

7. MURDER IN THE FIRST DEGREE—FACT CASE.—See evidence which,
though circumstantial in its nature, is *held* sufficient to sustain a convic-
tion for murder in the first degree.

## ON REHEARING.

8. PRESENTMENT OF INDICTMENT.—Article 415 of the Code of Procedure re-
quires that the presentment of an indictment shall be entered on the
minutes of the court. This entry may sufficiently designate the indict-
ment by its file number, without naming the defendant.

9. ARRAIGNMENT AND PLEA.—The arraignment of the defendant in a cap-
ital case, and his plea of not guilty, were recited in the same entry on the
minutes of the court as that whereby his application for a change of ve-
nue was disposed of. *Held*, sufficient.

10. PRACTICE IN COURT OF APPEALS.—Objection to evidence must be pri-
marily taken in the trial court, and if taken in that court it can be con-
sidered by this court only when presented by a proper bill of exceptions.

11. SAME.—If the record were silent as to whether the defendant in a felony
conviction was asked before sentence if he had anything to say why the
sentence should not be pronounced against him, this court would pre-
sume that the trial court performed that duty. In the present case, how-
ever, that fact is sufficiently shown by the recitals set forth in the entry
of the sentence.

APPEAL from the District Court of Austin. Tried below be-
fore the Hon. L. W. Moore.

At the April term, 1882, of the District Court of Fort Bend
county the grand jury presented an indictment against F. W.
Bohannon, the present appellant, charging that, on or about
December 7, 1881, in the said county of Fort Bend, he did "with

malice aforethought kill J. L. Knox, by shooting him with a gun." At a subsequent day of the same term the defendant filed an application for a change of venue, alleging that by reason of prejudice and a dangerous combination against him in Fort Bend county he could not expect to obtain there a fair and impartial trial. The Presiding Judge of the District Court of Fort Bend county, Hon. W. H. Burkhart, sustained the application, but, of his own motion and over the objections of the defendant, changed the venue to the county of Austin, instead of the county of Wharton, the court house of which was the nearest to that of Fort Bend. For this action the judge assigned reasons which will be found in the opinion of this court. The defense reserved exceptions to so much of the ruling as sent the case to the county of Austin.

In the District Court of Austin county, at its July term, 1882, the defense .led a plea to the jurisdiction of that court, and as the gravamen of the plea set forth the proceedings relative to the change of venue had in the District Court of Fort Bend. The court overruled the plea to its jurisdiction, and also the exceptions to the indictment referred to in the opinion of this court. The defense reserved exceptions to this action of the trial court.

At the January term, 1883, of the District Court of Austin county, the cause came to trial on the defendant's plea of not guilty. The jury found him guilty of murder in the first degree, and assessed his punishment at confinement in the penitentiary for life. His motion for a new trial was overruled, and he appealed.

There was no eye-witness of the homicide, and the inculpatory evidence is circumstantial with respect to the defendant's agency in its perpetration, which, practically, was the only issue controverted at the trial.

Doctor B. W. Bell was the first witness introduced by the prosecution. He testified that, in his capacity of surgeon, he was called upon to examine the body of J. L. Knox, the deceased, before the coroner's inquest. He conducted the examination on the west bank of the Brazos river, near Thompson's switch, in Fort Bend county, on the eleventh day of December, 1881. He found the left portion of the cranium entirely gone, and a hole in the other and opposite side of the head, about one and a half inches in diameter. The edges of the hole were jagged, and the skin was broken loose. There were also three fractures of

the skull pointing outward in line from the hole. Two cuts on the left ear were clear and sharp, as if made by small buckshot. They were not made by the fist, else they would have been more or less serrated in appearance. In the opinion of the witness, the deceased came to his death by means of gunshot wounds, the hole above referred to being the point of exit. The gun must have been fired in very close proximity, though there was no discoloration or powder burn. The range of the shot, judging from the appearance of the wounds, was slightly upwards. A surgeon can readily determine the points of entrance and exit in gunshot wounds. Three fractures, in this case, diverged from the hole in the right side of the head. Witness could not tell what made the two holes in the ear.

L. M. Jones was the next witness for the prosecution. He testified that he was acquainted with defendant and knew deceased in his life time. He last saw deceased alive on December 7, 1881, at his, witness's, store, at Thompson's switch, Fort Bend county. Deceased had been in the employ of the witness, and in settlement, some time during the preceding October, the witness paid him something over one hundred and thirty-seven dollars. The witness went to Galveston on December 7, 1881, and sent for the deceased to take charge of his store in his absence. He returned from Galveston on the west bound passenger train on the same evening, reaching the switch a few minutes before seven o'clock. The defendant met the witness at the depot, and walked with him to the store, where they found the deceased. The deceased counted out to the witness what money he had taken in during the day, and showed witness what entries he had made on the day book. This occupied from ten to fifteen minutes. Knox, the deceased, and Bohannon, the defendant, left the store together at about half-past seven o'clock that evening.

The witness next saw Knox dead, on the bank of the Brazos river, on the eleventh day of December, 1881. He did not see the body taken from the river. On the eighth day of that month the defendant told the witness that Knox had gone to Louisiana—that he saw Knox board the train going towards Galveston, on the night before. Search for the body of Knox began on the eighth day of December, and the witness was one of the searching party. The witness saw a number of signs of blood, a piece of skull, a knife which had belonged to Knox, and a paper of candy, on the ground where something had been

dragged towards the river, near the point where, on Sunday, December 11, the body of the deceased was taken from the river. The places where these signs were found were heavily wooded. Blood was found in the road about one hundred and fifty yards from the river. This road ran within fifteen or twenty feet of the front of A. Cox's house, which was the nearest house to where the blood was found, and distant from the blood signs about two hundred yards, and between there and Thompson's Switch.

When the defendant was at the witness's store, on December 8, he told the witness that Knox requested him, defendant, to tell the witness to pay the thirty dollars witness was due him, Knox, to Mrs. Knox. He also told the witness that he had bought Knox's stock, etc.; that he tried to dissuade Knox from leaving but could not. Several days before this, Knox gave the witness, to keep for him, a buckskin pocket book containing two one-hundred-dollar bills, one being a silver certificate, and other bills to the amount of thirty dollars, and on December 3, needing more money than he had, the witness took the thirty dollars from the purse and substituted his due bill for that amount, and told Knox of it. On that day Knox and the defendant were butchering together at Thompson's Switch.

The general reputation of the defendant was that of a quiet, peaceable young man. He was, at the time of the killing, and had been for some time, engaged in shipping and selling cattle for his father and mother, and in buying and selling cattle on his own account. He was perfectly reliable in money matters, and had thoroughly good credit with the witness. The witness had often loaned him money, and had often seen him with money. Some three or four weeks before the disappearance of Knox, the defendant offered the witness a hundred-dollar bill to change. The defendant and Knox were on intimate terms, and the former boarded with the latter. The witness identified the body on the river bank as that of J. L. Knox, and saw the things taken from his pocket. Among these things was a red morocco pocket book, another than the one he had deposited with witness, containing some eight or ten dollars in silver, but no paper money; a pair of gold sleeve buttons which the witness identified as belonging to Knox, a rice button and a pencil memorandum.

The witness did not lend the defendant one hundred dollars in bills on the seventh day of December, 1881. He did not, on that day, lend him any amount of money. The due bill for thirty

dollars spoken of has never been presented for payment. That amount has been passed to Knox's credit on the witness's books. Knox owed the witness a balance of eighteen or twenty dollars, which then left a balance yet in his favor. The road running in front of Cox's house, and on which the blood was found, and from which the "drag" led off to the river, was the main traveled road leading from Thompson's Switch to the Wiley Jones place on which Knox lived. The blood was found on this road about one and a half miles from Thompson's Switch. The defendant was arrested at J. L. Knox's house about daybreak on the tenth day of December, 1881.

The south bound freight train passed Thompson's Switch between eight and nine o'clock at night, and usually checked up on account of a curve near the switch. Witness testified before the examining court and upon the hearing for bail. His memory was then good.

Jesse Thompson testified, for the State, that in December, 1881, he was clerking in the store of Henry Voss at Thompson's Switch. Between the hours of nine a. m. and one p. m. on the seventh day of that month, the defendant brought a double barreled shot gun to that store, and placed it in a side room where the witness slept. On the same afternoon he offered to bet the witness twenty dollars that the witness could not guess who was going to "jump the town" that night. That night he and Knox came to the store together, remained a short while, and left together on foot. After they had been gone some time, defendant came back alone on horseback. He got down from his horse, got his gun from the side room, and rode off again in the same direction that he and Knox had previously gone. He had been gone about one hour when he returned to the store and put the gun in the same room again. He then called the witness out of the store, and said that he would tell the witness who it was that left the town.

The defendant and witness sat down on a log some fifteen or twenty steps from the store, and the defendant then told the witness that it was Mr. Knox who had gone; that he did not know where Knox had gone to, but that he saw him jump on the third car from the engine on the freight train going towards Galveston. He said that Knox told him a great many things before he left, none of which the defendant repeated to the witness. He said further that he got down on his knees and begged Knox not to leave, but that his begging did no good. He, de-

fendant, told the witness that he bought of Knox six or seven horses, about thirty-five head of hogs, and about seventy-five bushels of corn, for which he paid Knox one hundred dollars. He then asked the witness what he should do about telling Mrs. Knox, and the witness advised him to tell her at once. He closed the interview by saying that Knox said that the witness could pay Mrs. Knox the fifteen dollars he was due for board, or do as he, witness, pleased about it.

On Friday, December 9, 1881, Alex. Clarke and others came to the switch and told the witness about the discovery of the blood in the road, and the "drag" leading to the river. The witness prepared to go with them to examine the blood, etc., but as the west bound train arrived just at that time he changed his mind, boarded the train and went to Richmond, Fort Bend county, where, before Justice Stansbury, he made affidavit that, according to the best of his knowledge and belief, the defendant, F. W. Bohannon, had on December 7, 1881, murdered J. L. Knox, the deceased, by shooting him with a shot gun. The witness was then a deputy sheriff of Fort Bend county. On Saturday, December 10, 1881, with Alex. Clarke, Ferris Thompson and others, the witness examined the blood in the road, and the "drag" to the river. He found the tracks of a horse, shod in front, going up and down the river near the water edge. He found also the tracks of unshod horses. He found also a man's track, number four or five high heeled boot or shoe. Defendant, his cousin, S. S. Bohannon, and Wiley Jones, all living in the neighborhood, wear number four or five shoes or boots. On December 7, 1881, the defendant rode what might be called a roan horse, shod in front—the only shod horse in the neighborhood that the witness knew of. Witness saw the defendant and J. J. McCann pulling the shoes off this horse on Thursday, December 8, 1881, near Voss's mill. Witness saw also, at or near the water edge, the print of three fingers of a man's hand, and a willow stick, which looked as if it had been used to push something into the river.

The witness went to the house of S. S. Bohannon on Friday, December 8, and told him that he wanted him, S. S. Bohannon, the defendant and Wiley Jones to go with the witness to make a search for the deceased and investigate the matter of his disappearance. He did not tell S. S. Bohannon at that time that the defendant was suspected of being the agent of the disappearance of the deceased. S. S. Bohannon told the witness that he would find the defendant at Knox's house. The witness was

one of the party that arrested the defendant at Knox's house. He saw there the gun the defendant left at Voss's store on the night of December 7, 1881. Witness did not remember the day on which the defendant took the gun away from the store, but thought it was on December 8, 1881. The witness, who was accustomed to the use of fire arms, examined the gun on Sunday morning. The right hand barrel had, in the opinion of the witness, been discharged within from two to four days. The left hand barrel was heavily charged with mixed buck shot and a few goose shot. The freight train on which the defendant said that the deceased had left did not stop or check up at Thompson's Switch, but passed it running at from thirteen to fifteen miles an hour.

The witness subscribed ten dollars to the fund to procure counsel to prosecute this case. He had also threatened to kill the defendant if acquitted. He made this threat because he had received a letter stating that the defendant would kill him if he escaped conviction on his trial, and the witness believed, from his knowledge of the defendant, that he would do it. The witness was asked if he did not, in the jail at Richmond, in the presence of Dave Randon and others, say that he knew that the defendant did not kill Knox, and that he would take back all charges he had preferred. The witness answered that he did not, but could repeat what he did say; which it does not seem that he did, or was asked or allowed to do. The place where the "drag" led down to the Brazos river, and near which the body was found, was a regular watering place for cattle and horses, and the only place near there where a man could ride a horse near the water's edge, and was the nearest point on the river bank to the point where the blood was found. Witness found cattle and horse tracks near the water, but found the tracks of but one shod horse. The soil near the edge of the water was damp and sandy, and higher up the bank it was of red clay, hard and dry. The witness was at Mrs. Thompson's party a few nights before the killing, and heard Knox forbid his wife dancing with Henry O'Neal.

Ferris Thompson was the next witness introduced by the prosecution. He testified that, on Wednesday night, December 7, 1881, at about eight or half past eight, he saw the defendant and the deceased leave Thompson's Switch together, the deceased taking with him on his horse a white and a black chicken, tied together. Just before that, and while the chickens were being

caught, the defendant rode off in the direction of Voss's store, and returned, when he and the deceased rode off in the direction of Knox's house. The witness saw no gun in the hands of the defendant at the time, though he could have had one alongside of his horse without the witness seeing it. This was the last the witness saw of Knox, alive. After Knox and defendant left, the witness went to the depot to return a lantern Knox had borrowed, and from there went to Voss's store, where his brother, Jesse Thompson, himself and John Brice engaged in a game of "seven up" at cards. Within about an hour after the defendant and Knox left, the defendant returned to Voss's store, where the game of cards was then being played, and brought and deposited a double barreled shot gun in the side room of the store. Passing out he called to Jesse, the brother of the witness, and the two went out of the store together and talked, the witness did not know what about, for some ten or fifteen minutes. As the defendant went away, the witness heard him say to Jesse: "Don't tell it to-night." On Thursday, December 8, or possibly on Friday, December 9, the witness saw the defendant and J. J. McCann pulling shoes off the fore feet of the horse ridden by the defendant on the day and night of Wednesday, December 7, 1881. On Friday, Alex. Clarke· and others came to the switch and told about the discovery of blood and brains in the road, and of the "drag" to the river; and the witness and others went to make investigation.

In the road leading by the house of A. Cox from the switch to Knox's house, and about two hundred and fifty yards from Cox's house, the investigating party found blood and brains, and, near by, white and black· chicken feathers with blood on them; and within one or two hundred yards from this point they found the same two chickens with which Knox left the switch. The chickens were still alive and tied together just as they were when Knox got them from the witness at the switch. The party examined the "drag" from the road to the water edge, and found a knife, piece of skull bone, blood, etc. They saw also the track of a horse, shod in front, going down the bank of the river and up the bank from the water edge; also, the track of a man who wore a number four or five boot or shoe, and the prints of three fingers of a man's hand in the wet sand.

The witness had known the defendant all of his life, and had considered him a quiet, peaceable young man. He had frequently seen the defendant with money. The freight train

bound for Galveston passed Thompson's Switch on the night of December 7 while the witness was in Voss's store. Witness could not say at what rate of speed it was running, but knew that it neither stopped nor checked up at the switch. Two or three days before Knox was killed, and while he and Bohannon were in Richmond together, the witness saw Mrs. Knox ride off in one direction, and, in about one hour, Harry O'Neal rode off in another direction, saying that he was going fishing. If Jesse Thompson was at or near the mill when the witness saw McCann pulling the shoes off defendant's horse, the witness did not see him. Several parties were passing to and fro at the time, and witness paid no particular attention to any of them.

Anthony Cox was the next witness for the State. The substance of his testimony was that between eight and nine o'clock on the night of December 7, 1881, while sitting on his gallery, he saw the deceased and the defendant pass his house, traveling from the direction of Thompson's Switch towards Knox's house. The road ran within five or six steps of the witness's door; the night was one of brilliant moonlight, and the witness was positive that he recognized the defendant and Knox. A few minutes after they passed, the witness heard the report of a gun in the direction they had gone, and afterwards saw blood and brains on that road, about three hundred yards from his house, and in the direction of Knox's house.

On the night before, some one passing the house of the witness fired a gun or pistol into his yard. Witness went to his landlord, S. S. Bohannon, and asked him what to do about it, and S. S. Bohannon told him that, if it was repeated, to fire on the parties, and that he would see that witness was not hurt for it. Witness did not tell Mr. Mitchell, counsel in this case, in Houston, Texas, that the means by which he recognized the defendant, when passing his house on the night of December 7, was that defendant fired into witness's yard the night before, and witness was sitting at his door watching for him that night. On Friday night, December 9, S. S. Bohannon and Wiley Jones came to the witness's house, and, it being dark, witness did not recognize them. Sid. Bohannon called to the witness to come out, and witness asked who was with him, and he said that it was Wiley Jones. Witness then went to the door and had a conversation with them. If either the defendant or Knox had a gun when they passed witness's house on the night of December 7, 1881, the witness did not see it. Witness was on the look-

out for parties who fired into his yard on the night before.    The witness was between fifty and sixty years old, could see very well, and did not use glasses.

Alex. Clarke was the next witness for the State.    He testified that on Thursday evening, December 8, 1881, he received information that blood had been found on the road at the point described by the several witnesses.    Witness went and examined the place, and found there a pool of blood, in which was mixed brains and white and black chicken feathers.    This witness described the "drag" and signs on the river bank of a shod horse, a man's tracks, finger prints, etc., as described by previous witnesses.

A short time after the witness got home on this evening (Thursday, December 8), the defendant and Mrs. Knox passed the witness's house, traveling from the direction of the switch towards Knox's house.    Mrs. Knox passed on, and the defendant stopped and asked the witness if he could not haul Mrs. Knox a load of wood the next day; that Mrs. Knox had nothing to pay with, but that he would pay witness.    Witness then asked defendant where Knox was, and he said that Knox took the freight train on the night of December 7, and had gone, and that he, defendant, had bought Knox's stock for one hundred dollars.

On the next morning, Friday, the defendant and Mrs. Knox passed the house of witness, going towards the switch.    In going to and returning from the switch on Thursday evening and Friday morning, defendant and Mrs. Knox did not travel the main road from Knox's house to the switch, but a pathway which leaves the main road a short distance from the witness's house, and between his house and the blood spots.    Neither did the path lead directly to the switch, but passed through the woods to Jones's wood yard, a half mile above the switch.    On Friday morning the witness went to the switch and notified Jesse Thompson and others of the blood, "drag," etc.    Ferris Thompson and others went back with witness to where the blood was, and on the "drag" they found a knife, recognized as Knox's, a piece of skull bone, and some other articles; and in the woods near the blood, they also found two chickens, a white and a black, tied together, and having blood on them.    The witness assisted in the search for the body until it was found on Sunday morning, and if the defendant was present at any time during that search, the witness did not see him.

On Wednesday evening, December 7, 1881, at about two o'clock, the defendant, with a gun, passed the house of the witness. going towards Thompson's Switch. On that night, at about nine o'clock, while the witness was at church, about two miles from his house, he heard the report of a gun in the direction of his house, which stood between the church and the point where the blood spots were found, and about three-quarters of a mile from the blood.

Jim Robinson testified, for the State, that he with others engaged in the search for the body of the deceased, and on Sunday morning found it in the river twenty-five or thirty feet from where the "drag" led to the bank of the river. Witness was in a boat, feeling the bottom of the river with a long pole, to which he had attached a cotton hook. The hook caught in the legs of a man's body which had lodged against a log on the bottom. Witness dragged the body into the boat and brought the boat ashore. The body lay in the boat, untouched, until after the coroner's jury had sat on it, and adjourned. Sheriff Blakely paid the witness for his services.

Clarissa Wright testified, for the State, that she lived with the deceased in December, 1881. She saw the defendant there on December 7, 1881. On that day he employed the witness to wash on the next day, which was regular wash day, among other articles of clothing, a pair of pants, on the leg of which there were blood spots. Witness did not know whether they were human or animal blood spots. Mr. Knox left home on the morning of December 7, about daylight, for Thompson's Switch, to stay that day in Jones's store. Witness saw him no more alive. The defendant remained at Knox's house that day until some time in the evening, when he rode off towards the switch. He returned about ten o'clock that night, and, Mrs. Knox having retired, he directed witness to tell her to get up as he had news of importance to tell her. Mrs. Knox got up and the witness went into her room and told her that the deceased had left the country.

Milton Richardson was at Mrs. Knox's house on the night of December 7, 1881, and asked for Mr. Knox. He said that he had come to bring Mr. Knox a horse which had been running on the range. He had no gun with him that night. Witness once saw an old Enfield rifle at Milton's house. It was the regular wash day on which the witness washed the defendant's pants. It was nothing unusual to find blood on the defendant's pants,

as he and Mr. Knox had been butchering together. Knox and defendant were quite intimate.

J. S. Brice, for the State, testified, in substance, that he was at Voss's store on the night of the killing. While there the defendant came in and got a shot gun out of Jesse Thompson's room and went off. From a half hour to an hour afterwards he returned and put the gun back where he got it, and called Jesse Thompson out of the store, where they talked some ten or fifteen minutes. Witness could not say how long the defendant was gone that night, between the time he left Voss's store and the time he returned. He could not say that it was more than a half hour, but it may have been an hour.

Sam. Marshal testified, for the State, that the defendant approached him at Voss's store and asked him if he wanted to make a hundred dollars. Witness asked him how, and he said that he would tell the witness at another time. The following night, behind Robinson's crib, defendant proposed to pay the witness a hundred dollars if he, the witness, would kill Mr. Knox. Witness asked him why he wanted Knox killed, and he replied that he was afraid Knox would detect him in improper relations with his, Knox's, wife; and that Mrs. Knox had agreed to marry him within a year's time, if he or other parties would remove Knox. He gave witness directions how to proceed about shooting Knox, and told the witness that he would find a shot gun behind a tree near Knox's house, and to be sure to pull the right hand barrel, as the left sometimes failed.

On the next morning he, defendant, told the witness that he had moved the gun from behind the tree to a pile of rails, where witness would find it. Witness found the gun in the rail pile and then went to find and inform Knox. He did not find him that night, but on the next morning he told Knox that the defendant had offered him, witness, a hundred dollars to kill him, Knox. Knox replied to the witness: "Oh, go off. I don't want any such d—d lies and reports brought to me." Defendant's offer was to pay the witness one hundred dollars in cash, and one hundred and fifty more when he sold his cattle in the spring. Defendant said to the witness that he had "offered one d—d fool the money, and he would not take it."

Cross-examined, the witness stated that he had resided at Thompson's Switch, off and on, for a year or two. He had worked in Houston and Galveston, and in Brazoria and Fort Bend counties, and gave the names of his various employers

and length of service with each. He had been a soldier in the Federal army and had received a discharge. His acquaintance with the defendant was limited, and he had spoken to him but few times. Witness communicated this proposition of the defendant to Milton Richardson and Gus. Owens, who are witnesses in this case.

According to the testimony of John Tyler, introduced by the State, the defendant on two occasions offered to pay him, Tyler, if he would accompany him while he, defendant, shot and killed Knox. Defendant said that he wanted to get rid of Knox and marry his widow. The witness refused. On one occasion, a few days before the disappearance of Knox, the defendant took the witness to a ditch near the railroad, where he had a gun secreted. Witness looked up the road and saw Knox coming down it. He remarked: "Yonder comes Mr. Knox now," and picked up the gun and ran off with it, and kept it at camp until morning, when he returned it to the defendant at Knox's house. Defendant asked the witness to keep the matter secret, but the witness told his father-in-law, Robert Jones, before Knox's disappearance. Jones was present to testify as a witness in this case. The witness ran off with the gun because he feared that the defendant intended to kill Knox, and he did not want to be involved in the murder.

The widow of the deceased, since married, was the next witness for the State. Stripped of unnecessary detail, her narrative was to the effect that she last saw Knox alive on the morning of December 7, 1881, when he left home about daylight to go to Jones's store at Thompson's Switch. The defendant lived at the home of Knox, and was not charged board, he and Knox being on the most intimate terms. He left the house on that evening about three o'clock, saying that he was going hunting. He had no gun with him then, but took powder and shot in small bottles. He left horseback, and returned horseback about half past nine o'clock that night. Witness had retired, but, on hearing him ask for an interview in order to communicate important information, she got up, dressed, and admitted him to her room. He then told her that, despite his protests, Knox had boarded the freight train and left the country, after swearing him to say nothing about it; that he had bought all of Knox's stock for one hundred dollars, borrowing the money from L. M. Jones with which to pay Knox; that Knox had directed him to purloin his, Knox's, clothes from the house and forward them,

and to kidnap the child of his deceased sister then in charge of the witness, and deliver the child to its father, Wiley Jones; that just before he boarded the train Knox released two chickens he had procured at his former residence, with these words: "Fly to h–ll; I will soon be there too." When the defendant left the house that day, he had a rope tied to his saddle.

The defendant stayed at the house of the witness, with her consent, on the night of December 7, and on the succeeding nights until his arrest on Saturday morning, December 10. On Thursday morning, December 8, the witness went with defendant to McCann's at the switch, traveling part of the way on the main or usual route, but diverging into a path which the defendant said was the dryer route. This path left the road before reaching the point where the blood was found. At the station the witness inquired if Knox had left the country. The witness also went to the switch with the defendant on Friday. *En route* the defendant asked the witness if she would marry again in a year's time if Knox did not return. Witness was offended, but replied that the "absence of Knox for a year would be equivalent to her swearing to a divorce."

The witness remained where she was then living until January 5, 1882, when she went to Houston, Texas. She detailed her movements in Houston until she secured board at the house of Doctor Worthington; none of which details have a direct bearing upon any question in this case. Proceeding with her statement, the witness said that on Friday, December 9, when they reached the trail on their way to McCann's, the defendant left her, saying that he was going to look for Knox's mare, which broke loose from where it was tied at the switch on the night Knox left. About ten o'clock, after witness had reached McCann's, the defendant rode up to McCann's, leading the mare. The witness knew nothing of the blood spots being found, nor that the defendant was suspected, until Friday night, December 9, when she was told by Wiley Jones. The defendant rode a roan pony, shod in front, when he left Knox's house on the afternoon of Wednesday, December 7.

On Tuesday night, December 6, 1881, Knox had in his pocket a buckskin pocket book containing one one-hundred-dollar greenback bill, one one-hundred-dollar silver certificate, a due bill for thirty dollars signed by L. M. Jones, and a memorandum of articles for the child, to be sent to and filled in Galveston. Knox took these with him to the switch next morning,

and the witness has not since seen them. The defendant then owned a red morocco pocket book, which Knox had given him. That pocket book was in the defendant's trunk on the morning of December 7, 1881, after Knox left the house. It was the same pocket book which the witness received from the coroner's jury, and which was said to have been taken from Knox's body. It contained something over six dollars in silver when the witness received it from the coroner's jury. Harry O'Neal was at the house of the witness twice after Knox's death, but within ten days he left the country. The defendant kept a winchester and a six shooter at Knox's house.

J. J. McCann next qualified for the State. The important portions of his testimony were to the effect that the defendant, having made to him similar statements to those he made to others concerning the deceased and the purchase of the stock, brought to the witness, on Friday, December 9, the bay mare which Knox usually rode, and which he claimed to have purchased from Knox, and requested the witness to keep and use her for her feed. The mare had stains and mud about her withers, which the witness curried off. He could not tell whether or not it was blood, and supposed at the time that it was slobber from another horse. On Thursday or Friday, in the presence of Ferris Thompson and others, the witness assisted the defendant in taking shoes off the fore feet of a bay or roan horse. Harry O'Neal was the witness's brother-in-law. O'Neal stayed about the switch after the killing until after Christmas.

Sheriff T. M. Blakely testified, for the State, that he arrested the defendant on Saturday morning, December 10, 1881. He took from the person of the defendant a buckskin pocket book containing a one-hundred-dollar greenback bill, a one-hundred-dollar silver certificate, and thirty dollars in other paper money. When witness got to Voss's store with defendant, the defendant stepped up to Harry O'Neal and handed him a one-hundred-dollar bill. Witness asked him what he meant, and he replied that he had more money about him than he wanted to carry to jail. Witness replied that defendant was a prisoner, that everything about his person was in his, witness's, custody, subject only to the orders of the court. Witness made O'Neal give him the bill, and he has it yet in his possession.

Cross-examined, the witness said that on his arrest the defendant said he knew that Knox was not dead, for he had left the country. When witness heard of the finding of Knox's

body, he went into the jail and told defendant that the body of Knox had been found in the river, and the defendant cried. The witness did not think it strange for a man to cry upon hearing of the murder of his friend. Witness had aided to employ counsel to prosecute in this case, and had paid them fees out of his own money. At this point the State closed.

Mrs. F. E. Bohannon, mother of the defendant, was the first witness for the defense. The substance of her testimony was, that she was a resident of Richmond, Texas, and that the defendant, who, on December 7, 1881, was, and for some time had been, an inmate of the Knox household, at Thompson's Switch, was engaged in shipping cattle for herself and his father, and trading in cattle on his own account. Defendant and the deceased were unusually intimate, so much so that the witness entrusted to Knox, who was the older, a general oversight over the defendant. The defendant received from the witness and her husband an interest or percentage on all money realized by him on sales of cattle, and was fully authorized to act for them. On December 2, 1881, witness went from Richmond to Thompson's Switch, to have a settlement with defendant for cattle sold a month before. On the same day defendant and Knox went to Richmond, the two trains meeting between the two points; a fact which witness did not learn until she reached Thompson's Switch. Witness reached the switch at 3 o'clock p. m., and went straight to Knox's, finding no one at home but a baby lying on a pallet on the gallery. Mrs. Knox came to the house after dark. Defendant and Knox returned later, and the witness and defendant had a settlement. The defendant got his money from Knox, paid the witness her share, and had some three or four hundred dollars left over as his interest, including two, and the witness thought three, one-hundred-dollar bills.

While at Knox's house that night, the witness heard some low talking on the gallery and walked out there. As she did so, some one jumped off the gallery and ran around the house. Mrs. Knox, who was on the gallery, replying to a question of the witness, said that it was Harry O'Neal. This was before the defendant and Knox got back from Richmond. Mrs. Knox told witness that Knox was going to leave the switch and move to the Wiley Jones place; that she would rather die than go there, and that if she ever got rid of Knox she would never marry again.

W. R. Goss, cashier of Beard's bank in Richmond, testified, for

the defense, that he remembered paying to the defendant three hundred and seventy-five dollars and fifty-five cents on Mrs. F. E. Bohannon's draft, and two hundred and sixty-three dollars and forty-seven cents on W. O. Bohannan's draft. Witness may have paid him other drafts, but did not remember. In paying these drafts, witness paid the defendant either four or five one-hundred-dollar bills, but could not remember whether they were greenback or silver bills.

Mrs. Mary Thompson testified, for the defense, that she was at Knox's house a short time before his disappearance, while he and defendant were in Richmond. While Mrs. Knox was dusting the defendant's clothes, the witness saw a red morocco pocket book in the defendant's trunk, containing a number of currency bills, and among them three or four one-hundred-dollar bills.

S. B. Pentacost testified, for the defense, that he bought one or two car loads of cattle from the defendant, as the agent of his father and mother, in October, 1881, and paid him some amount between three and seven hundred dollars. Witness did not remember whether he paid in money or draft.

Jesse Thompson, called by the defense, testified that he did not say in jail, in the presence of Randon and others, that he knew the defendant had not killed Knox, and would take back what he had said to that effect.

Frank Randon, testifying for the defense, corroborated Jesse Thompson, and said that Thompson, in the jail and on the occasion alluded to, said to defendant: "I know now you did not write that letter, and I will take back all I said about it."

William Thomas, for the defense, testified that in his hearing in the Richmond jail, Jesse Thompson said to defendant: "I know that you did not kill Knox, and I will take back all I said about your killing him."

Frank Conley testified that he was conductor on the mixed train that ran out from Galveston on the night of December 7, 1881. Harry O'Neal went out from Galveston that night, paying his fare to Richmond. He did not get off at Thompson's Switch, as the witness saw him on board after passing that point. Witness did not see him get off at Richmond. L. M. Jones also was a passenger out from Galveston, and left the train at the switch.

R. W. McGowan, cattle and hide inspector, testified that he

inspected a bunch of cattle for shipment for the defendant in October, 1881.

Wiley Jones, for the defense, testified that about eight or half past eight o'clock on the night of December 9, he rode up to A. Cox's house, with S. S. Bohannon. The latter called to Cox, who asked him who was with him, and Bohannon told him. Though witness was within eight or ten feet of Cox, and though Cox had known him from childhood, Cox did not recognize witness that night, until told by Bohannon. The road runs as far as fifteen or twenty steps from Cox's door. S. S. Bohannon corroborated the witness as to this incident.

S. S. Bohannon, a cousin to the defendant, was the next witness. He testified, in substance, that as soon as he learned that the defendant was suspected of the murder of Knox, which was on Friday, December 9, he went to the defendant and told him, and advised him to leave the country if he was guilty, proffering to supply him with money if he had none for that purpose. The defendant replied: "Cousin Sid., I did not do it, and I am not going to leave for a thing I did not do." The witness reiterated that the neighborhood believed him guilty, and advised him to leave if he was; but the defendant protested that Knox was not dead but had left on the freight train, and persistently declared that he was innocent—he would not leave. After witness returned home on that night, Jesse Thompson came to his house and said that he wanted witness, defendant and Wiley Jones to go with him to hunt O'Neal, who was suspected of the murder. Witness replied: "That is too thin, Jesse. You think I have Buddie (defendant) secreted, but you are mistaken. You can find him at Knox's, where I have just left him." Two months after this, at Voss's mill, Jesse Thompson said to the witness that Harry O'Neal was acting very suspiciously, and that he did not believe that any one man could have done so much alone in an hour, and that if the defendant killed Knox he must have had help.

The traveled road from the switch to Knox's runs by the witness's place, and very near the river in one or two places between the house and the switch. Witness's house stands between the switch and the place where the blood was found. The plot of the ground exhibited by J. C. Mitchell was not exactly correct. It made the road bend more towards the river than it ought. Witness, Mitchell and Moore examined the ground where the blood was found. Witness showed Mitchell where he

S

had picked up some gun wadding, which was to the left and very near the edge of the road. Mitchell stepped the distance, some ten or twelve steps. The blood was on the right hand side of the road. On a line, and some ten or twelve steps distant, the witness found three shot holes in a hackberry tree, some six feet up the stem. Witness afterwards cut the buckshot exhibited out of the tree with a chisel.

The witness saw Knox on Wednesday, December 7, 1881, riding his bay mare. Next day defendant told witness that the bay mare had broken loose at the switch on the night before, and that he wanted witness to hunt for the mare and put her in the pasture, as she was part of the stock he had bought from Knox. Witness found and pastured the mare as requested, but some one got her out of the pasture. Witness next saw her in the possession of McCann. Witness identified the body taken from the river on December 11, 1881, as that of Knox.

Sam. Ryan, for the defense, testified that some two or three weeks before the killing he, Knox, defendant and several others went on a cattle drive, and came back some days sooner than was expected, and went to Knox's house after dark. Witness went into the kitchen, and while there heard Knox talking in an angry manner to his wife, saying: "What the h—ll does this fine set supper mean?" About this time some one jumped off the gallery, and both Knox and Mrs. Knox afterwards told witness that it was Harry O'Neal. The Brazos bottom below the switch was heavily set with timber, thicket, vine and bushes—many places where a man could be killed and hidden and not found for many months, and defendant was perfectly familiar with this bottom. Witness had often seen defendant with money. Mit Jones corroborated this witness as to the character of the river bottom.

Guy Thompson testified, for the defense, that he was one of the "investigating party," and that he did not see the tracks of a shod horse at the river bank on Friday or Saturday. He saw a man's track, which he took to be a number six or seven. At the water edge to which the "drag" led, the witness picked up the piece of cloth exhibited, which appears to be a piece of striped bed ticking. It had three or four stains, which witness took to be blood stains, and some cockle burs on it when witness found it.

Being asked by the State if any one had tried to induce him to testify in the interest of the defense, or to prevail on his

brother, Jesse Thompson, to modify his testimony, the witness hesitated and finally declined to answer until ordered by the court and requested by counsel for defense. He then said: "Some time after the inquest and before the hearing on *habeas corpus,* I got into trouble and came near having my little place sold from under me. I was working at the carpenter's bench when Mrs. Bohannon came to me and said she knew of my troubles and would help me if I would help her; that she had the money and could do it, and that if I would use my influence with my brother Jesse, and induce him to modify his testimony in the interest of the defendant, that she would make it all right about my house and see that I did not lose it."

Mrs. F. E. Bohannon recalled: "I saw Guy Thompson and told him to assist me all he could. I did not offer him any money or to pay him to induce Jesse Thompson to modify his testimony, but told him that I needed help, and that, as he was poor, I did not want him to be out anything, but would myself pay any expense he might incur in aiding me."

Less Martin testified, for the defense, that she was at Knox's on the morning they moved from the switch to the Wiley Jones place, and heard Mrs. Knox say that she would rather die than move, and that she wished some one would kill Mr. Knox; at which the defendant laughed, when Mrs. Knox said: "You, Buddie Bohannon, are as mean as Mr. Knox."

Rufus Haywood testified that he was a blacksmith and worked at his trade for two or three months in the summer and fall of 1881, at Thompson's Switch. He shod horses for Mr. Voss, defendant, and other parties, and mules for some one. He quit working at the switch in October.

With reference to the position of the blood and the places where S. S. Bohannon said he found the wadding, and the hackberry tree with the shot holes in it, George Moore testified as S. S. Bohannon did about the ground. He stated, however, that he was with Clarke and others when they examined the ground a day or two after the killing. He then saw the blood and pieces of wadding near the road, the wadding not more than two or three steps from the blood.

J. C. Mitchell, for the defense, testified to his examination of the ground in substance the same as S. S. Bohannon. While this case was pending on *habeas corpus* in Houston, witness asked A. Cox if he was not mistaken in saying he recognized the defendant and Knox as the two men who passed his house

on the night of December 7, 1881. Cox said, "No, I am not mistaken." Witness said: "Anthony, you are getting old; your eyesight is not as good as it used to be, and it was in the night time. Is it not possible you may be mistaken in saying you saw the defendant and Knox pass your house, and that you recognized them?" After considerable hesitation Cox answered: "No, Captain Mitchell, I am not mistaken, for I was watching for them."

Charley Williams testified, for the defense, that he heard Knox say, in Jones's store, on December 7, 1881, that he was going to Louisiana. Several were present at the time. Defense closed.

In rebuttal, the State introduced Alex. Kerr. He testified that after the mixed train from Galveston reached Richmond, on the night of December 7, 1881, Harry O'Neal came into witness's house in Richmond, and after remaining a few minutes left. Next morning witness and Wessendorf went to Galveston, and O'Neal traveled with them as far as Thompson's Switch.

Henry Leach, for the State, testified that O'Neal came to his house, in Richmond, at about nine o'clock on the night of December 7, 1881, and after remaining about thirty minutes left.

Motion for new trial arraigned the ruling of the court refusing a continuance, attacked the charge of the court, and assailed the verdict as contrary to the law and evidence, and as informal and insufficient to support a judgment.

*Mitchell & Pierson*, and *Breedlove & Ewing*, for the appellant.

*W. L. Davidson*, also for the appellant: The first error to which I desire to call the attention of the court is in changing the venue to Austin county. By reference to our Code of Criminal Procedure we find that there are three modes of changing the venue, and we submit that when a change is made it must be done in accordance with some one of these modes:

1. It can be done by the judge, on his own motion. When it is thus done, the judge can change the venue *to any county in his own* or of the adjoining districts. (See Art. 575, Code Crim. Proc.)

2. It can be done upon the application of the State for certain causes, and when it is done under this section the language of the statute is, that it shall be sent to any county in his own

or an adjoining district. (Code Crim. Proc., Art. 577.) It will be seen that both these articles are mandatory as to the change, and that the only limitation upon the judge as to what county he will send it to is that the county must be in his own or some adjoining district.

3. It can be changed for certain causes upon the application of the defendant, and here the language of the statute is changed and reads thus: "The cause shall be removed to some adjoining county, the court house of which is *nearest* to the court house of the county in which the suit is pending, unless it be made to appear to the satisfaction of the court that said nearest county is subject to some objection sufficient to authorize a change of venue in the first instance." (Code Crim. Proc., Art. 581.) If it be shown that all the adjoining counties are subject to some objection, then it may be changed to any county the court may think proper. (Code Crim. Proc., 582.) It will be seen from this that while the law is still mandatory as to the change, yet there is a limitation put upon the court as to where it shall be sent, and that limitation is *the nearest court house.* It is hardly probable, and I think quite impossible, that the legislative mind meant nothing by this change of language. On the contrary, the meaning seems quite clear to my mind. First, under Article 576, a change is prescribed when the judge is satisfied that a fair trial cannot be had. In this article the law pre-supposes that the matter has reached such a state of notoriety that the feeling either for the one side or the other has reached such a state as to call it to the judicial notice without a motion from either side, and in such a case, when the feeling has become so notorious, the law pre-supposes that the adjoining counties can hardly be free from that taint; hence the judge is not limited to the nearest court house.

Under Article 577, when the district attorney alleges a lawless combination, the law pre-supposes that the parties who compose that lawless combination have some little influence with their neighbors, and that the adjoining counties will hardly be free from the taint; hence, no limitation. But where it comes to the defendant's application, a different state of case arises. We all know how easily an application of the sort can be made by the defendant, his kindred and friends, even where very little or no cause really exists; hence, while the law will not set aside his application as being wholly false, yet it receives it *cum grano salis,* and, while changing the venue for him, yet it wishes to

put the witnesses to as little trouble and expense as possible, and it sends it to the nearest court house. In this case the court granted the application and sent the case to the most remote county, directly in the teeth of the statute, and I submit that where a change of venue is granted upon the application of the defendant, that the statute is mandatory and the cause must be sent to the nearest court house.

Some light may be thrown on the subject by looking to the evils that existed, and the remedies intended by the statute. As it is part of the history of the State, I will say that at the time these laws were passed, bitter feuds existed between large bodies of men in several of the counties of our State; outrages by one body upon the other were frequent, and this feud sometimes extended over two or three counties, and a trial in any of these counties by one of these bodies for an outrage committed upon the other was simply a farce, and this statute was passed to enable the judge to send the case outside of the influence of either body.

The next error to which I desire to call the attention of the court is, that the defendant has been convicted of an offense upon which he has not been tried, and with the commission of which he has not been charged; in other words, he has been convicted of murder in the first degree, while the pretended indictment upon which he has been tried, if good for any offense at all, is only good for murder in the second degree.

That the court may more easily understand the point here raised, I copy the following articles of our Constitution and provisions of our Penal Code and Code of Criminal Procedure. Section 19, Article 1, State Constitution, is as follows: "No citizen of this State shall be deprived of his life, liberty, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land." Section 10, Article 1, says: "In all criminal prosecutions the accused shall have speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him; and no person shall be held to answer for an offense unless upon an indictment against him."

The design in enacting this Code is to define in plain and intelligible language every offense against the laws of this State, and to affix to each offense its proper punishment. (Art. 2, Penal Code.) In order that the system of penal law in force in this State may be complete within itself, and that no system of

foreign laws, either written or unwritten, may be appealed to, it is declared that no person shall be punished for any act or omission, unless the same is made a penal offense, and a penalty is affixed thereto, by the written law of this State.  (Art. 3, Penal Code.)

Whenever it is found that a provision of the penal law is so indefinitely framed, or is of such doubtful construction that it cannot be understood either from the language in which it is expressed, or from some other written law of the State, such penal law shall be regarded as wholly inoperative.  (Art. 6, Penal Code.)

"Every person with sound memory and discretion who shall unlawfully kill any reasonable creature in being within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder.  Murder is distinguishable from every other species of homicide by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide."  (Art. 605, Penal Code.)

"All murder committed by poison, starving, torture, or *with express malice*, or committed in the perpetration, or in the attempt at the perpetration, of arson, rape, robbery or burglary, is murder in the first degree, and all murder not in the first degree is murder in the second degree."  (Art. 606, Penal Code.)

"Whenever it is found that this code fails to furnish a rule of procedure in any particular state of case which may arise, the rules of the common law shall be applied and govern."  (Art. 27, Crim. Proc.)

"The offense must be set forth in plain and intelligible words."  (Subdivision 7, Art. 420, Crim. Proc.)

"*Everything must be stated in an indictment* which it *is necessary to prove*, but that which it is not necessary to prove need not be stated."  (Art. 421, Crim. Proc.)

"*Where a particular intent is a material fact in the description of the offense, it must be stated.*"  (Art. 423, Crim. Proc.)

I desire to call the attention of the court to the following well settled and long established rules of pleading:  If any difference exist between civil and criminal pleadings, it requires more certainty in criminal than in civil pleading.  "The pleader is held to a more accurate description of his case in criminal than in civil pleading.  2. The pleader must correctly describe his cause of action."  (*Gammage* v. *Alexander*, 14 Texas, 414.)

3. "He cannot declare upon one cause of action and recover upon another." (*Shipman* v. *Fulcrod,* 42 Texas.)

4. "The *allegata* and *probata* must correspond." (*Banks* v. *The State,* 28 Texas.)

5. "Facts not alleged cannot be proved." (*Austin* v. *Mayblum,* Galveston Term).

6. "Facts not alleged cannot form the basis of a judgment." (*Hall* v. *Jackson,* 3 Texas, 305.)

7. "That in crimes of different degrees or grades, while the greater includes the smaller grade, yet the smaller degree can not include the greater."

8. "That where there are different grades the pleader can only convict of the highest grade declared upon." (*Blackburn* v. *The State,* 39 Texas, 153.)

9. "The pleader, if he recover at all, must recover upon the identical cause declared upon." (*Mims* v. *Mitchell,* 1 Texas, 443.)

10. The Legislature cannot by law dispense with allegations and proof, in penal cases, of facts or circumstances which form the gist of the offense. (*Hewit* v. *The State,* 25 Texas, 721; *The State* v. *Wilburn,* 25 Texas, 737; *Marshall* v. *The State,* Galveston term, 1883.)

It will be seen from the foregoing that our statute, so far as defining offenses and prescribing a punishment is concerned, is complete within itself, but it remands us to the common law for a rule of procedure where it fails to furnish one.

It also, unlike the common law, divides murder into two degrees, first and second, and groups murder in the first degree into three classes.

1. All murder committed by poison, starving, or with expressed malice.

2. All murder committed in the perpetration of robbery, rape, burglary, or arson.

3. All murder committed in the attempt of robbery, rape, burglary, or arson. (Art. 606, Penal Code.)

It will also be seen that while it makes *express malice* one of the essential elements in murder in the first degree, yet it fails to define what express malice is; but how far this failure is to come under the rule in the sodomy cases, I am not prepared to say, and will not urge, as I am confident the case will be reversed on another ground. Malice aforethought is an evil design; and express malice aforethought is an *evinced* evil design or intent, which evil design or intent may be proved by

former grudges, antecedent menaces, lying in wait, deliberately compassing, and the like.

The appellant has been convicted on the following charge: That F. W. Bohannon did, with malice aforethought, in the county of Fort Bend, on the seventh day of December, 1881, shoot and kill J. L. Knox, with a gun. Is this a good charge of murder in the first degree? I say emphatically that it is not. Aside from the fact that whether or not J. L. Knox was a man, aside from the fact that it is left to inference who or what J. L. Knox was, there is not a single element of murder in the first degree charged.

I submit that where it is not charged that the homicide was committed either by poison, starving, torture, or in the perpetration, or the attempt at the perpetration, of robbery, rape, burglary, or arson, it must charge express malice aforethought to make it murder in the first degree.

I submit that where neither one of the above elements are charged, the distinguishing feature of murder then is express malice.

I submit that express and implied malice aforethought are the distinguishing features between murder in the first and second degrees; express malice aforethought being murder in the first, and implied malice aforethought being murder in the second degree. (*McCoy* v. *The State*, 25 Texas, 33; *Ake* v. *The State*, 30 Texas, 466.)

I submit further that when one of the elements or constituents of murder in the first degree is express malice aforethought, the State must, by direct and positive allegations, charge express malice aforethought, or set out facts which when proved will show the existence of express malice aforethought.

Under the common law, where the distinction between the first and second degree is not drawn, the killing being alleged, the law presumed all the elements of murder, and exculpatory facts had to be shown by the defendant; but, under the distinction drawn by our statutes, the only presumption arising under the indictment is just what the indictment alleges. (*Ake* v. *The State*, 30 Texas, 466.)

Implied malice aforethought is a question of law for the court. Express malice is a question of fact for the jury to determine upon, and *must* be proved as every other fact. (*McCoy* v. *The State*, 25 Texas, 33; *Ake* v. *The State*, 30 Texas, 466.)

I submit then that if it be a fact, it must be alleged before it can be proved.

When a particular intent is a material fact in the description of an offense, it must be stated. (*Johnson* v. *The State*, 1 Texas Ct. App., 146.)

It must be alleged in plain and intelligible language that the accused did the things which constitute the offense. (*Moore* v. *The State*, 7 Texas Ct. App., 42.)

It is essential that the indictment, in plain and unambiguous language, apprise the defendant of the particular violation of the law he is called upon to answer. (*Meschac* v. *The State*, 30 Texas, 518.)

It is safest to use the exact language of the statute in the description of an offense; but if the pleader depart from them and substitute words of his own, then the substituted words must be equivalent to, or of a broader signification than the words of the statute. (*Wupperman* v. *The State*, 13 Texas, 33; *White* v. *The State*, 3 Texas Ct. App., 605.)

These requirements of our statutes are safeguards upon humane principles thrown by the sovereign power of the State around the life, liberty, and property of each citizen.

I am aware of the fact that our courts have said that it was not necessary to charge express malice, but by examining those cases the court will see that it was where the facts were alleged, and the facts so alleged constituted express malice, and under such circumstances it was not necessary to allege a conclusion of law. But in *Farrer* v. *The State*, 42 Texas, 265, a case in which the facts were set forth fully, and showed a wanton, cruel and unprovoked murder by a hale, hearty and athletic young man upon a weak, old and decrepit one, under circumstances not only showing express malice, but very nearly amounting to torture, I took the case up on two errors, one the charge of the court, and the other that the indictment did not charge express malice, and Justice Moore, delivering the opinion, reversed it upon the charge of the court, and says that the court is not in harmony on the other point. Had not the facts been set forth, I apprehend that the court would have been harmonious.

Counsel for the State take much comfort from the case of *Dwyer* v. *The State*, 12 Texas Court of Appeals, 535. That case is not applicable to the one at bar. That was a case of murder in the second degree, and the reasoning is in exact accordance

with *McCoy* v. *The State*, by Justice Roberts, 25 Texas, 33; *Ake* v. *The State*, 30 Texas, 466, by Justice Caldwell; and *Farrer* v. *The State*, 42 Texas, 265. Courts only decide the question in issue before them. The only point before the court in that case was the sufficiency of the indictment for murder in the second degree, and to that point does the decision apply. Had the question of murder in the first degree been presented, I apprehend that a different conclusion would have been made. I suggest to the court that the defendant is entitled to the benefit of the doubt, and where the charge is murder without defining the degree, that the defendant can only be put upon trial for the lower degree.

*J. H. Burts*, Assistant Attorney General, for the State, filed an able brief and argument.

WILLSON, JUDGE. Defendant has been convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, upon an indictment of which the charging portion reads as follows: "That F. W. Bohannon, on or about the seventh day of December, one thousand eight hundred and eighty-one, in the county of Fort Bend and State of Texas, did then and there with malice aforethought kill J. L. Knox, by shooting him with a gun; contrary to law and against the peace and dignity of the State."

It is assigned as error by the defendant that the court erred in overruling exceptions to the indictment. These exceptions, specifically stated, are, 1, that it is not alleged that Knox, the murdered man, was a "reasonable creature;" and 2, that it does not allege "express malice," or any other facts constituting murder in the first degree, and is therefore not a good indictment for murder in the first degree.

It has never been held necessary that the indictment should allege that the deceased was a "human being," or a "reasonable creature," although in the definition of murder one or the other of these descriptions of the deceased are used. To allege the name of the person killed, or that his name is unknown, is a sufficient allegation that the deceased was the subject of murder, as it will be presumed that the indictment is understood according to the import of the common language used therein. (Code Crim. Proc., Art. 425; Penal Code, Art. 10; 2 Bish. Cr. Law, sec. 506; *State* v. *Stanley*, 33 Iowa, 526; *Perryman* v. *The State*,

36 Texas, 321; *Reed* v. *The State,* 16 Ark., 499; 1 Archb. Cr. Pr. and Pl., 784; 1 Whart. Prec., 114.)

That the averment in the indictment, that the homicide was committed with "malice aforethought," is insufficient to charge murder in the first degree is an objection which has been held untenable by numerous decisions of the courts of this and other States. "Malice aforethought" includes both *express* and *implied* malice, and is sufficient to charge murder in either degree. (*Gehrke* v. *The State,* 13 Texas, 568; *White* v. *The State,* 16 Texas, 206; *Wall* v. *The State,* 18 Texas, 682; *Perry* v. *The State,* 44 Texas, 473; *Stapp* v. *The State,* 3 Texas Ct. App., 138; *Henrie* v. *The State,* 41 Texas, 573; *Longley* v. *The State,* 3 Texas Ct. App., 611; *Dwyer* v. *The State,* 12 Texas Ct. App., 535; *Peterson* v. *The State,* Id., 650.) We hold that the indictment in this case is a good one for murder in the first degree, and that the court did not err in overruling the exceptions to it.

Another assignment of error is that the court erred in changing the venue of the case; that, in ordering the change, the case should have been sent to Wharton instead of to Austin county. This prosecution was instituted in Fort Bend county, where the homicide was committed. Defendant made application for a change of venue, under Article 578 of the Code of Criminal Procedure, setting forth, 1, that there existed in Fort Bend county so great a prejudice against him that he could not obtain a fair and impartial trial therein; and, 2, that there was in said county a dangerous combination against him, instigated by influential persons, by reason of which he could not expect a fair trial. This application was supported by the affidavits of several persons, and was not controverted; and the judge granted the same. But, instead of sending the case for trial to Wharton county, which was the adjoining county to Fort Bend county, and the court house of which is nearest to the court house of Fort Bend county, the court ordered it transferred to Austin county. In the order changing the venue the judge sets forth his reasons for sending the case to Austin instead of to Wharton county, as follows: "The venue of this case is changed to Austin county for the reason that a trial alike fair and impartial to the State and the defendant cannot be had in Wharton county. The business and personal relations of the people of this and Wharton county are intimate. This case has created quite a sensation in this section, and it has been a matter frequently discussed in Wharton county, as the court well knows, having heard the

same.  The county of Wharton is sparsely settled; and, considering all the circumstances of the case, the court deems it but just to all the parties to change the same to some other county than Wharton; and Austin county is fixed upon by the court."

This action of the court, in so far as it sent the case to Austin instead of to Wharton county, was excepted to at the time by the defendant, and is presented in a proper bill of exceptions for the consideration of this court.  It is earnestly and ably insisted by counsel for the defendant that the court, in sending the case to Austin county, of its own motion, exceeded its legal discretion and authority.

We deem it unnecessary to enter upon an extended discussion of this question, inasmuch as we think it has been fully elucidated and clearly determined in previous decisions rendered by this court.  In *Preston* v. *The State*, 4 Texas Court of Appeals, 186, this precise question was presented, and the court said: "After a careful examination of the statute, we are satisfied that the court did not err in declining to remove the cause to Clay county.  If it was known to the court that the same objection existed in Clay county as in Montague, it did not require further proof of that fact, but the court would be authorized to change the venue to some county adjoining Montague not subject to any valid objection." In *Brown* v. *The State*, 6 Texas Court of Appeals, 286, the same question was again presented, and the Preston case was cited and approved to the effect that the presiding judge had the authority, upon his own motion, in granting an application for a change of venue made by the defendant, to order the case to any county in his own or in an adjoining district, if he was satisfied that a trial alike fair and impartial to the accused and the State could not, from any cause, be had in the county where the cause was pending.

This power of the judge is derived from Article 576 of the Code of Criminal Procedure, which reads as follows:  "Whenever, in any case of felony, the district judge presiding shall be satisfied that a trial alike fair and impartial to the accused and to the State cannot, from any cause, be had in the county in which the case is pending, he may, upon his own motion, order a change of venue to any county in his own or in an adjoining district." This article was added to the Code by the Act of August 21, 1876, and conferred upon district judges a power not previously possessed by them.  In *Cox et al.* v. *The State*, 8 Texas Court of Appeals, 254, it was urged by counsel for the defend-

ants that the article was unconstitutional; but the court in an elaborate opinion maintained the constitutionality of the provision, and again re-affirmed the doctrine announced in the cases of Preston and Brown, before cited. In the Cox case, above cited, the venue of the case was changed, upon the judge's own motion, from DeWitt to Bexar county, the judge reciting in his order his reasons therefor, as follows: "That the judge is satisfied that there exists in this county influences resulting from the terrorism prevailing among the good people of the county which will prevent a trial alike fair and impartial to the accused and the State, it is ordered," etc. It was held by this court that the reasons recited were sufficient to justify the action of the court, although the case was not sent to the nearest county, and no reason was assigned why it was not.

We are of the opinion, and so hold, in accordance with the former decisions of this court, that under Article 576 of the Code of Criminal Procedure, which we have quoted, the judge had the authority, of his own motion, to send this case for trial to Austin county. He was clothed with this discretion by the express and unqualified words of the law, and this law was enacted under the express sanction of the Constitution. (Const., Art. 3, sec. 45.) It is true that this discretion is a judicial, and not a personal one (*Walker* v. *The State*, 42 Texas, 360; *Dupree* v. *The State*, 2 Texas Ct. App., 613); yet, it being a discretion created and confided by the law, it will not be revised by this court in the absence of any showing that it has been abused to the prejudice of the defendant. Such has been the uniform practice of this court, established by numerous decisions, and from which we see no reason to depart. (*Noland* v. *The State*, 3 Texas Ct. App., 598; *Johnson* v. *The State*, 4 Texas Ct. App., 268; *Labbaite* v. *The State*, 6 Texas Ct. App., 257; *Daugherty* v. *The State*, 7 Texas Ct. App., 480; *Cox* v. *The State*, 8 Texas Ct. App., 254; *Myers* v. *The State*, 8 Texas Ct. App., 321; *Grissom* v. *The State*, 8 Texas Ct. App., 386; *Webb* v. *The State*, 9 Texas Ct. App., 490.)

It has been ably argued by counsel that it is dangerous to the liberties and rights of the citizen to confide to its district judges such unrestricted power as is conferred by the broad and unqualified language of Article 576, above quoted, and that it should be limited by the provisions of Article 581, following it. We do not regard Article 581 as being restrictive of the powers conferred by Article 576, and whether or not the power com-

plained of is a dangerous one to be vested in district judges is not a question for this tribunal to determine. We will say, however, that, since the enactment of Article 576, no case has come under the observation of this court in which the discretion conferred had been, in our opinion, abused. And in the case we are now considering we fail to discover any abuse of this discretion, and there is no pretence, or at least no effort is made to make it appear, that the defendant has in any respect been injured in his rights, or prejudiced by the action of the court, in sending the case to Austin county, instead of to Wharton county, for trial.

Defendant's third assignment of error is that, "the court erred in overruling the application for a continuance, filed January 16, 1883." We find no bill of exception to this action of the court in the record, and therefore we could not revise the alleged error, even if it was error. Without a bill of exceptions in the record, the refusal of a continuance will not be revised. (Clark's Cr. Laws, p. 474, note.)

Other assignments of error relate to the charge of the court as delivered to the jury, and to the refusal of the court to give certain charges requested by defendant's counsel. We have given these assignments a careful consideration, and we find no error in the court's charge. While it is unusually brief, it is clear and full, and presents the whole law of the case plainly and correctly. It is, in our opinion, an admirable exposition of the law applicable to the facts. Such being the charge, there was no error in refusing the charges requested by defendant's counsel, as they contained nothing proper to be given which was not already embraced in the general charge of the court.

In passing upon the only remaining assignment of error, that the court erred in refusing to give the defendant a new trial for the reasons set forth in his motion for a new trial, we must say that we think the new trial was properly refused. We have carefully considered the evidence as presented by the statement of facts, and, while it is circumstantial, it is, to our minds, irresistibly convincing of the defendant's guilt. It possesses that cogency which produces a moral and absolute certainty, to the exclusion of every other reasonable hypothesis, that the defendant, and no other person, committed this most atrocious murder. There is no good reason disclosed by the record for setting aside the judgment of his conviction, and granting him a new trial. He has had a fair trial, so far as we are able to judge from the

record. He has been zealously and ably defended by experienced counsel, and before this court his case has been argued with an earnestness and eloquence characteristic of the learned counsel who represented him.

We have found no error in the proceedings, and the judgment of conviction is in all things affirmed.

*Affirmed.*

Opinion delivered May 2, 1883.

[REPORTERS' NOTE.—A motion for rehearing being filed and argued, it was disposed of by the following opinion on a subsequent day of the term.]

WILLSON, JUDGE. In so far as this motion again presents the questions discussed and determined by the opinion heretofore delivered in this case, we will say that our confidence in the correctness of the conclusions arrived at and announced in that opinion has not been shaken, and we therefore adhere to those conclusions without consuming further time in their discussion. Counsel for appellant have very ably re-argued those questions, but, while we are impressed with the strength of their reasoning, and the force of their arguments, we think the law has been well settled against their propositions.

Some questions are presented by the motion for re-hearing which were not presented on the former hearing of the case, and which we will now consider.

1. That the indictment does not appear to have ever been returned into court and record made of the fact. This objection is not, we think, supported by the record. We find in the record an entry showing the return into court, and presentment by the grand jury, of the indictment, designated by its file number; which, we think, is in compliance with the law. (Code Crim. Proc., Art. 415.)

2. It does not appear that defendant was ever arraigned on and pleaded to the indictment; and 3. It does not appear that defendant ever pleaded to the indictment in the county where the prosecution was instituted. These two objections are contradicted by the record. We find in the record the following entry, made upon granting defendant's motion for a change of venue, to wit:

"On this day came on to be heard the motion of the defendant, F. W. Bohannon, for a change of venue, the State appearing by the district attorney. Whereupon the defendant, F. W.

Bohannon, *was arraigned, and entered his plea of not guilty,* and the court, after considering said motion," etc.

4. It appears that evidence was admitted on the trial prejudicial to the defendant, that is wholly inadmissible in any case under any possible state of facts. This objection refers to the admission in evidence of the transcript of the proceedings had in the case in the District Court of Fort Bend county, prior to the change of venue to Austin county, and including the order of the court making such change. It does not appear that any objection to the admission of this evidence was interposed by defendant at the time it was offered, nor was any motion made to exclude it; nor is there any bill of exception in the record in any way relating to it. If evidence is not objected to in the court below, it cannot be objected to in this court, and, if objected to in the court below, such objection cannot be considered by this court unless presented by proper bill of exceptions.

5. It does not appear that defendant was asked the statutory question, why sentence should not be passed on him. We find in the sentence this recital: "The motion of defendant in this cause for new trial having been overruled, and said defendant being present in open court, and being asked by the court if he had any legal reason to assign why the sentence of the law should not be pronounced against him in accordance with the verdict of the jury and the judgment of the court heretofore had and entered of record in this cause, gave none." We certainly think that this recital shows a compliance on the part of the court with Article 798 of the Code of Criminal Procedure. But, if the record was entirely silent upon this subject, we would presume that the court below had performed its duty, and had asked of the defendant the statutory question. We have discussed this question in *Johnson* v. *The State,* decided to-day, and in that case held that it was not necessary that the record should show that, before pronouncing sentence, the defendant had been asked if he had anything to say why the sentence should not be pronounced against him.

Notwithstanding the earnest and able arguments advanced in behalf of appellant by his distinguished counsel, we can perceive no error for which the judgment should be set aside. That the defendant may, perchance, be innocent of the crime of which he has been convicted, is within the bounds of possibility; but, so far as we are able to judge from the record, he had a fair and impartial trial, and, upon sufficient evidence, has been found

guilty by due course of law; and, such being our view of the case, it is our duty to overrule the motion for a rehearing, which is accordingly done.

*Motion overruled.*

Opinion delivered May 30, 1883.